MORGAN, LEWIS & BOCKIUS LLP
Eric Meckley, Bar No. 168181
eric.meckley@morganlewis.com
Brian D. Berry, Bar No. 229893
brian.berry@morganlewis.com
Roshni C. Kapoor, Bar. No. 310612
roshni.kapoor@morganlewis.com
One Market
Spear Street Tower
San Francisco, CA  94105-1596
Tel:     +1.415.442.1000
Fax:     +1.415.442.1001

MORGAN, LEWIS & BOCKIUS LLP
Jonathan D. Lotsoff (*pro hac vice* forthcoming)
jonathan.lotsoff@morganlewis.com
110 North Wacker Drive
Chicago, IL 60606-1511
Tel:     +1.312.324.1000
Fax:     +1.312.324.1001

Attorneys for Defendants
TWITTER, INC. and X CORP.

MORGAN, LEWIS & BOCKIUS LLP
Joseph A. Govea, Bar No. 319683
joseph.govea@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Phone: +1.213.612.2500
Fax: +1.213.612.2501

MORGAN, LEWIS & BOCKIUS LLP
Carolyn M. Corcoran, (*pro hac vice*)
carolyn.corcoran@morganlewis.com
101 Park Avenue
New York, NY 10178-0060
Tel:     +1.212.309.6000
Fax:     +1.212.309.6001

Attorneys for Defendants
TWITTER, INC. and X CORP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ZEMAN, on behalf of himself and all others similarly situated,

Plaintiff,

v.

TWITTER, INC. and X CORP.,

Defendants.

Case No. 3:23-cv-01786-SI

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

Date:      June 30, 2023
Time:      10:00 a.m.
Judge:    Hon. Susan Illston

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' REQUEST FOR
JUDICIAL NOTICE
CASE NO. 3:23-cv-01786-SI

## **REQUEST FOR JUDICIAL NOTICE**

In accordance with Federal Rule of Evidence 201, Defendants Twitter, Inc. and X Corp. (collectively "Defendants") respectfully request that this Court take judicial notice of Exhibits 1 through 3 attached to this Request for Judicial Notice in connection with Defendants' Motion to Dismiss the Complaint.

Rule 201 allows a court to take judicial notice of facts that are "not subject to reasonable dispute" because they are either (1) "generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001))).

This Court can take judicial notice of Exhibit 1 because court orders and filings are the type of documents that are properly noticed under Rule 201. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice "of several other pleadings, memoranda, expert reports, etc." from related litigation because they are "matters of public record"); *see also Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (recognizing district court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"); *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1112-14 (C.D. Cal. 2003) (granting judicial notice of court orders and civil minutes, including the "existence and legal effect of the documents").

This Court can take judicial notice of Exhibits 2 and 3 because they have been incorporated by reference into Plaintiff's Complaint in this action. Plaintiff cites and quotes to the New York Times article attached as Exhibit 2 in paragraph 18, and Plaintiff cites and quotes

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANTS' REQUEST FOR
JUDICIAL NOTICE
CASE NO. 3:23-cv-01786-SI

to the FOX article attached as Exhibit 3 in paragraph 23 of the Complaint.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (holding that on a motion to dismiss, the court "must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference"); *Khoja*, 899 F.3d 988 at 1005 (finding, under incorporation-by-reference doctrine, that district court did not abuse discretion by incorporating article quoted in plaintiff's complaint).  Further, Exhibits 2 and 3 also are subject to judicial notice because they are publicly available news articles.  *Kang v. PayPal Holdings, Inc.*, 2022 WL 3155241, at *7 (N.D. Cal. Aug. 8, 2022) ("Publicly accessible websites and news articles are among the proper subjects of judicial notice.").

Accordingly, Defendants hereby requests that this Court take judicial notice of the following documents:

1.      **Exhibit 1** is a true and correct copy of the Order Granting Motion to Dismiss (ECF No. 38), filed on May 8, 2023, in *Strifling, et al. v. Twitter, Inc.*, Case No. 22-cv-07739-JST, filed in the United States District Court for the Nothern District of California.

2.      **Exhibit 2** is a true and correct copy of Kate Konger, Ryan Mac, and Mike Isaac, *Confusion and Frustration Reign as Elon Musk Cuts Half of Twitter's Staff*, N.Y. Times, Nov. 4, 2022, at https://www.nytimes.com/2022/11/04/technology/elon-musk-twitter-layoffs.html (last visited May 4, 2023).

3.      **Exhibit 3** is a true and correct copy of Danielle Wallace, *'Lonely' Elon Musk says humans shouldn't live longer, they will 'asphyxiate' society*, FOX Business, March 27, 2022, at https://www.foxbusiness.com/lifestyle/lonely-elon-musk-humans-shouldnt-live-longer-asphyxiate-society (last visited May 4, 2023).

/ / /

/ / /

/ / /

/ / /

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANTS' REQUEST FOR
JUDICIAL NOTICE
CASE NO. 3:23-cv-01786-SI

1    Dated: May 12, 2023                    MORGAN, LEWIS & BOCKIUS LLP

2

3                                           By /s/ *Brian D. Berry*
                                               Eric Meckley
4                                              Brian D. Berry
                                               Jonathan D. Lotsoff
5                                              Roshni C. Kapoor
                                               Joseph A. Govea
6                                              Carolyn M. Corcoran

7                                              Attorneys for Defendants
                                               TWITTER, INC. and X CORP.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' REQUEST FOR
JUDICIAL NOTICE
CASE NO. 3:23-cv-01786-SI

EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLINA BERNAL STRIFLING, et al., | Case No. 22-cv-07739-JST |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO DISMISS** |
| TWITTER INC., | Re: ECF No. 20 |
| Defendant. | |

Before the Court is Twitter, Inc.'s ("Twitter") motion to dismiss. ECF No. 20. The Court will grant the motion.

I.   **BACKGROUND**

For the purpose of ruling on the instant motion, the Court accepts all the following facts as true. Plaintiff Carolina Bernal Strifling is a resident of Miami, Florida and was employed by Twitter from June 2015 to November 2022. ECF No. 1 ¶ 9. Plaintiff Willow Wren Turkal is a resident of San Jose, California and was employed by Twitter from June 2021 to November 2022. *Id*. ¶ 10.

Elon Musk acquired Twitter in October 2022. *Id.* ¶ 18. Musk has been criticized for making "sexist, demeaning, and hostile comments" against women. *Id*. ¶¶ 22-25. Soon after the acquisition, Twitter initiated a Reduction-in-Force ("RIF") that affected approximately 2,621 out of its 5,134 employees, most of whom were notified of their layoff on November 4, 2022. *Id*. ¶¶ 18, 20, 29. Musk brought in a small group of managers who made the layoff decisions under his supervision. *Id*.  ¶ 21. Plaintiffs were laid off during the RIF. *Id*. ¶ 46.[1]

---

[1] Plaintiffs do not explicitly state whether they themselves were laid off during the November 4, 2022 RIF, although the parties appear to accept this fact as true in their arguments. The Court will

United States District Court
Northern District of California

United States District Court
Northern District of California

Following the RIF, Musk implemented a policy that required employees to work more hours and in physical offices, rather than remotely as was previously permitted ("Post-RIF Policy"). *Id.* ¶ 41. On November 16, 2022, Musk sent a message to the remaining Twitter employees asking whether they agreed to work under new conditions that would be "extremely hardcore" and require "working long hours at high intensity." *Id.* ¶ 44. The message instructed those who wished to remain employed by Twitter to respond "yes" by the following day. *Id.* As a result of the "ultimatum," more employees chose to leave Twitter. *Id.* ¶ 45. Plaintiffs allege that the RIF and Post-RIF Policy forced a disproportionate number of women to leave Twitter and were the products of sex-based discrimination. *Id.* ¶¶ 26, 43, 45.

On December 7, 2022, Plaintiffs filed a complaint on behalf of themselves and other female Twitter employees whose jobs were affected by the "layoffs, terminations, and constructive discharges since Elon Musk acquired the company." *Id.* at 12. They bring claims under Title VII of the Civil Rights Act of 1964 ("Title VII") for sex-based discrimination. Plaintiffs also seek a declaratory judgement and injunction under 28 U.S.C. §§ 2201 & 2202 prohibiting Twitter from seeking the release of employees' claims without providing notice of their rights and this pending case. *Id.* Turkal brings an additional claim under the California Fair Employment and Housing Act ("FEHA") Cal. Gov. Code § 12900, *et seq. Id.*; ECF No. 27 at 32.[2] On December 8, 2022, Plaintiffs filed complaints with the Equal Employment Opportunity Commission ("EEOC"), and Turkal additionally filed with the California Department of Fair Employment and Housing ("DFEH"). ECF No. 27 at 18.

Twitter filed the instant motion on January 26, 2023, and the Court took the motion under submission without a hearing on March 27, 2023. ECF No. 32.

---

accept this as true for the sake of its analysis, however, Plaintiffs should allege the date that they were laid off if they amend their complaint.

[2] Plaintiffs concede that Turkal, not Strifling, is permitted to bring a FEHA claim, ECF No. 27 at 32, however, their complaint states Twitter's actions "constitute unlawful discrimination against *Plaintiffs* and other similarly situated female Twitter employees on the basis of sex in violation of the FEHA." ECF No. 1 at 12 (emphasis added). Because the Court is dismissing all of Plaintiffs' claims, Twitter's request to dismiss Strifling's FEHA claim is moot. However, Plaintiffs should, on amendment, correct their complaint to reflect that Turkal alone brings a FEHA claim.

2

II.     **JURISDICTION**

The Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

III.    **LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations need not be detailed, but facts must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While this standard is not "akin to a 'probability requirement' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In determining whether a plaintiff has met the plausibility requirement, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). A plaintiff may "plead[] facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Records, LLC v. Doe 3*, 603 F.3d 110, 120 (2d Cir. 2010)).

United States District Court
Northern District of California

IV.    DISCUSSION

A.    Exhaustion of Administrative Remedies

To bring a claim under Title VII, a plaintiff is required to first "exhaust her administrative remedies by filing a timely charge with the EEOC, or the appropriate state agency, thereby affording the agency an opportunity to investigate the charge" and obtain a right-to-sue notice before filing suit in federal court. *BKB v. Maui Police Dep't.*, 276 F.3d 1091, 1099 (9th Cir. 2002). A plaintiff who brings a claim under FEHA must do the same with the DFEH. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1135 (9th Cir. 2012). However, the Ninth Circuit recognizes equitable exceptions to the administrative exhaustion requirement "where the remedies are inadequate, inefficacious, or futile, where pursuit of them would irreparably injure the plaintiff, or where the administrative proceedings themselves are void." *United Farm Workers of Am., AFL-CIO v. Ariz. Agric. Emp't Rels. Bd.*, 669 F.2d 1249, 1253 (9th Cir. 1987); *see SJCBC, LLC v. Horwedel*, 201 Cal. App. 4th 339, 346 (2011). Thus, filing a timely complaint with the EEOC "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Similarly, the California Supreme Court has explained that although "[e]xhaustion of *administrative* remedies is 'a jurisdictional prerequisite to resort to the courts,'" *Johnson v. City of Loma Linda*, 24 Cal. 4th 61, 70 (2000) (emphasis in original) (quoting *Abelleira v. Dist. Court of Appeal,* 17 Cal. 2d 280, 293 (1941)), "'jurisdictional prerequisite' does not mean subject matter jurisdiction in the context of exhaustion of administrative remedies." *Kim v. Konad USA Distrib., Inc.*, 226 Cal. App. 4th 1336, 1347 (2014).

Twitter argues that Plaintiffs failed to exhaust their administrative remedies because they filed charges with the EEOC and DFEH only after they filed their suit in this Court.[3] ECF No. 20 at 17-18. Twitter further contends that Plaintiffs cannot cure this error by belatedly obtaining right-to-sue notices from the EEOC and DFEH. ECF No. 28 at 19. Plaintiffs concede that they

---

[3] The Court will not consider Plaintiffs' notices at ECF No. 29 and ECF No. 30 because they were filed after Twitter's reply without leave of the Court. *See* Civil L.R. 7-4(d).

United States District Court
Northern District of California

filed suit before filing charges with the EEOC and DFEH and receiving right-to-sue notices. ECF No. 27 at 18. However, they argue that the Court should permit their claims to proceed, rather than requiring them to refile after they receive the right-to-sue notices, because they filed the charges "nearly simultaneously with filing their initial complaint" and expect to receive the notices shortly. *Id.* They further argue that the administrative exhaustion requirement is non-jurisdictional such that the Court can and should excuse Plaintiffs from this requirement. Plaintiffs also argue that the EEOC's and DFEH's inability to enjoin Twitter from seeking terminated employees' release of claims without proper notice would irreparably harm the putative class. *Id.* at 20. Twitter replies that there is no such risk of irreparable harm because it already agreed to not seek any releases of claims, without notification of the instant suit, in another pending action. ECF No. 28 at 20. Thus, in Twitter's view, Plaintiffs' "purported emergency" was already "dispelled." *Id.*

The Court declines to excuse Plaintiffs' failure to exhaust their administrative remedies because they have not demonstrated that compliance with the requirement would irreparably harm the putative class. At the time Plaintiffs filed suit, Twitter had agreed to not seek the general releases of claims until a motion for a protective order in *Cornet v. Twitter, Inc.* was to be decided. Order Adopting Proposed Briefing Schedule, *Cornet v. Twitter., Inc*, No. 3:22-cv-06857-JD (N.D. Cal. Nov. 18, 2022), ECF No. 15. On December 14, 2022, the court granted the plaintiff's motion and ordered Twitter to "provide notice of the pendency of [the *Cornet*] case before asking an employee to release his or her legal claims." Order Re Litigation Notice, *Cornet v. Twitter, Inc.*, No. 3:22-cv-06857-JD (N.D. Cal. Dec. 14, 2022), ECF No. 42 at 3. The court approved a joint proposed notice that included information, not only on the *Cornet* case, but on the instant suit as well. Order Adopting Approving Joint Proposed Notice, *Cornet v. Twitter, Inc.*, No. 3:22-cv-06857-JD (N.D. Cal. Dec. 20, 2022), ECF No. 43-1 at 2; ECF No. 44.

However, even if Plaintiffs had exhausted their administrative remedies, the following deficiencies exist with the remaining claims.

**B.** **Disparate Treatment**

A plaintiff may bring a Title VII or FEHA claim on a theory of disparate treatment.

United States District Court
Northern District of California

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).[4]  Disparate

treatment occurs "where an employer 'treat[s] [a] particular person less favorably than others

because of' a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (quoting *Watson v.*

*Forth Worth Bank & Tr.*, 487 U.S. 977, 985-86 (1988)).  To state a disparate treatment claim, a

plaintiff must allege that "the defendant had a discriminatory intent or motive" in taking some

employment-related action against them.  *Watson*, 487 U.S. at 986.  Thus, "[i]t is insufficient for a

plaintiff alleging discrimination under the disparate treatment theory to show the employer was

merely aware of the adverse consequences the policy would have on a protected group." *Wood v.*

*City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012) (quoting *Am. Fed'n of State, Cnty., &*

*Mun. Emps. v. Washington*, 770 F.2d 1401, 1405 (9th Cir. 1985)).

Twitter argues that Plaintiffs fail to establish a prima facie case of intentional

discrimination either under the *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)

("*McDonnell Douglas*") or *International Brotherhood of Teamsters v. United States*, 431 U.S. 324

(1977) ("*Teamsters*") framework.  ECF No. 20 at 19.  Plaintiffs argue that that the statistics

demonstrating that women were impacted at a "highly disproportionate rate" during the RIF and

Post-RIF Policy – coupled with "overtly sexist statements" from Musk – support their allegations

of disparate treatment under either the *McDonnell Douglas* or *Teamsters* framework.  ECF No. 27

at 23.

As an initial matter, neither *McDonnell Douglas* nor *Teamsters* framework applies at the

pleading stage.  *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019); *Serrano v. Cintas*

*Corp.*, 699 F.3d 884, 897-898 (6th Cir. 2012).  Both frameworks employ "burden-shifting"

analyses, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 366-67 (2011); *Young v. Buttigieg*, No.

19-cv-01411-JCS, 2021 WL 981305, at *6 (N.D. Cal. Mar. 16, 2021), that are "plainly

inapplicable" at the pleading stage.  *Young*, 2021 WL 981305, at *6.  The Supreme Court in

---

[4] The Court analyzes Plaintiffs' Title VII and FEHA claims together because "California courts have relied upon federal interpretations of Title VII to interpret analogous provisions of the California Fair Employment and Housing Act (FEHA)." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).  Thus, "[d]iscrimination under FEHA and Title VII is proven using the same factors." *Wynes v. Kaiser Permanente Hosps.*, 936 F. Supp. 2d 1171, 1192 (E.D. Cal. 2013).

United States District Court
Northern District of California

6

United States District Court
Northern District of California

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002), held that because the *McDonnell Douglas* framework is "an evidentiary standard, not a pleading requirement," "the requirements for establishing a prima facie case under *McDonnell Douglas*" do not "apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." The Ninth Circuit in *Austin*, 925 F.3d at 1137, clarified that, rather than making a prima facie showing under either framework, a plaintiff who brings a Title VII claim must abide by the *Twombly* and *Iqbal* pleading standards. Thus, a plaintiff must provide "sufficient, nonconclusory allegations plausibly linking" the discriminatory conduct to the fact that the plaintiff is of a protected class to state a Title VII or FEHA claim. *Austin*, 925 F.3d at 1138; *accord Serrano* 699 F.3d at 897 ("*Swierkiewicz* compels the conclusion that a plaintiff is not required to plead whether she intends to employ the *McDonnell Douglas* or the *Teamsters* burden-shifting evidentiary framework.")

The Court finds that, although Plaintiffs are not required to make a prima facie showing under the *McDonnell Douglas* or *Teamsters* framework, they nonetheless fail to allege a plausible link between their layoff during the RIF and the fact that they are women, for two reasons.[5]

First, Plaintiffs' complaint is devoid of basic information: they do not describe their positions prior to the RIF or allege that they were performing satisfactorily in those positions.[6] Thus, they are unable to allege that similarly situated men were not laid off during the RIF.

---

[5] Plaintiffs also allege that the Post-RIF Policy was an act of intentional discrimination that "would clearly be expected to have (and did have) a disproportionate impact on women." ECF No. 27 at 23. A plaintiff must allege that "she was subject to an adverse employment action" to plead a disparate treatment claim. *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018). However, Plaintiffs were not subject to the Post-RIF Policy because they were no longer working at Twitter when it was enacted. Thus, the Court will not consider whether the Post-RIF Policy was an act of intentional discrimination against Plaintiffs.

[6] Plaintiffs argue that because "they were laid off, rather than terminated for cause" it is "impli[ed]" that their job performance was satisfactory. ECF No. 27 at 23 n.4. However, when a plaintiff is laid off during an RIF, the Ninth Circuit nonetheless considers if the plaintiff has sufficiently alleged their job performance was satisfactory. *Cf. Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1208 (9th Cir. 2008) (holding that there was a triable issue of fact whether the plaintiff, terminated as a part of an RIF, was performing his job satisfactorily). A plaintiff must ultimately allege facts – whether that includes allegations of their job performance – to establish a plausible link between the discriminatory conduct and the fact that the plaintiff is of a protected class. Thus, the Court addresses Plaintiffs' allegations of their job performance not because it is a required component of every pleading, but rather because Plaintiffs rely on it to speak to the plausibility of their claims.

7

*Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (describing those who "have similar jobs and display similar conduct" to the plaintiff as being "similarly situated"). Nor do they identify the "small group of managers" who acted "under the close supervision of Musk" in making the layoff decisions. Courts have consistently relied on this information to find a plausible link between the discriminatory conduct and the fact that the plaintiff is of a protected class.

For example, in *Hilber v. International Lining Technology*, No. C 12-00003 LB, 2012 WL 3542421, at *5 (N.D. Cal. Jul. 24, 2012), the court held that the plaintiff properly pleaded a claim for disparate treatment because he identified his position and further alleged that he "was not told of any problems with his job performance," had to "do less important and more menial tasks" while "Hispanic laborers hired from Laborers Local 139 Hall got to participate in seaming material and leak testing," and "was sent home early one day and was not given work on another day even though other laborers did work those days."

Similarly, in *Williams v. Wolf*, No. 19-cv-00652-JCS, 2020 WL 1245369, at *10 (N.D. Cal. Mar. 16, 2020), the court adopted "a broader view of causation" in light of the Ninth Circuit's "disavowal of applying the *McDonnell Douglas* prima facie case elements to a plaintiff's allegations at the pleading stage" and held that the plaintiff had sufficiently pleaded a claim for disparate treatment. The plaintiff alleged that her supervisor had stated that she would never support the plaintiff's promotion because the plaintiff had filed a grievance against her supervisor, "she ha[d] been singled out for criticism or discipline on a number of occasions for conduct that is common in her office by non-African American employees," and "her work performance was as good or better than that of her peers." *Id.*

Second, Plaintiffs also fail to allege that Twitter engaged in a pattern or practice of discrimination. When a plaintiff "allege[s] a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, [they] ultimately ha[ve] to prove 'more than the mere occurrence of isolated or accidental or sporadic discriminatory acts.'" *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (quoting *Teamsters*, 431 F.3d at 336); *see also Teamsters*, 400 F.3d at 336 ("[A] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized

United States District Court
Northern District of California

nature.") (quoting 110 Cong. Rec. 14270 (1964)).  The Ninth Circuit made clear that a pattern or practice is "discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace."  *Cherosky v. Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003).

Plaintiffs do not allege that discrimination was widespread throughout Twitter.  Instead, they allege that Musk, not Twitter, engaged in a pattern or practice of discrimination by implementing the RIF followed by the Post-RIF Policy.  ECF No. 27 at 24.  However, setting aside the issue of whether conduct solely attributed to Musk can be imputed to Twitter, the RIF and Post-RIF Policy are two discrete acts insufficient to support the allegation that discriminatory conduct was "a routine and regular part" of Twitter's workplace.  *See e.g.*, *Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346, 1364 (D.N.J. 1996) ("Another reason that plaintiffs' claim does not fall within the framework of a pattern-or-practice case is that the employment practice which plaintiffs assert was [the defendant's] standard operating procedure was used only once, i.e., the Guidelines were used only during [the RIF].").

Further, even if the Court did hold that the RIF and Post-RIF Policy constitute a "pattern or practice," Plaintiffs' remaining allegations, namely their statistics and Musk's statements, fail to support that Twitter knew that granting discretion to the managers would result in that discretion being used in a discriminatory manner.  It is true that, "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."  *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977).  However, the Supreme Court "ha[s] not suggested that any particular number of 'standard deviations' can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination."  *Watson*, 487 U.S. at 995 n.3.[7]  Rather, courts are required to assess "the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis" which reflects

---

[7] While *Watson* discussed the evaluation of statistics in the context of a disparate impact claim, its reasoning is nonetheless applicable to a "pattern or practice" claim because *Watson* relied on *Teamsters*, in which the court examined a "pattern or practice" claim.  *See e.g., Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 552 (9th Cir. 1982) (relying on the admonition in *Teamsters* that the usefulness of statistical evidence "depends on all of the surrounding facts and circumstances" in its decision to reject the proposition that standard deviations of 1.3 and 2.46 supported an inference of intentional discrimination as effectuated through a pattern or practice) (quoting *Teamsters*, 431 U.S. at 340).

United States District Court
Northern District of California

the recognition that "statistics 'come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.'" *Id.* (quoting *Teamsters*, 431 U.S. at 340). Absent the "facts and circumstances" discussed previously and which are commonly relied upon at the pleading stage – such as Plaintiffs' positions at Twitter, whether they were performing satisfactorily, the treatment of similarly situated men, and the identity of the managers – Plaintiffs fail to allege disparate treatment.

Plaintiffs' inclusion of "several of Musk's public statements belittling women and questioning their role in the workplace" do not cure this deficiency. ECF No. 27 at 25. "[T]he cold numbers" of statistics can be brought "convincingly to life" by personal experiences. *Teamsters*, 431 U.S. at 339 (1977). Plaintiffs argue that Musk's public statements are "anecdotal evidence" that serve this purpose. ECF No. 27 at 25. While "comments suggesting that the employer may have considered impermissible factors are clearly relevant to a disparate treatment claim . . . 'stray' remarks are insufficient to establish discrimination." *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). Isolated remarks, unrelated to the discriminatory employment decision, are generally insufficient to establish discriminatory intent. *See id.*; *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (holding that a comment "uttered in an ambivalent manner" and "not tied directly to" the plaintiff's termination was "at best weak circumstantial evidence of discriminatory animus"); *cf. Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985) (finding the defendant's statements that the "police force had no women and no Blacks" and encouraging plaintiff to apply for a department that was "literally begging for minorities and especially females" created a triable issue of fact despite plaintiff being unable to provide a "proper statistical record.").

Here, Musk's statements that Plaintiffs offer to demonstrate animus toward women, although more than isolated incidents, were not tied directly to the RIF, as Musk made them prior to his acquisition of Twitter. ECF No. 1 ¶¶ 22-25. Further, Plaintiffs do not allege that Musk made the layoff decisions, but rather that a group of managers did so under his supervision. *Id.* ¶ 21. Plaintiffs attempt to analogize this case to *Usher v. O'Reilly Automotive Inc.*, No. 14-cv-189 PA (FFMx), 2014 WL 12597587, at *5 (C.D. Cal. May 27, 2014), which is readily

distinguishable.  There, the court held that the plaintiff sufficiently stated a claim under FEHA, despite its acknowledgment that that "actual allegations may not show that the comments made to Plaintiff were 'directly tied' to Plaintiff's termination."  *Id.*  However, in *Usher*, the plaintiff had been directly subjected to discriminatory comments that increased in 2011 and "became an everyday occurrence by 2012."  *Id.* at 1.  At one point, the plaintiff's supervisor stated that the defendant had made undesirable changes in the plaintiff's schedule "in hopes that Plaintiff would quit voluntarily due to his age."  *Id.*  Musk's comments do not rise to the level of those in *Usher* so as to constitute sufficient, nonconclusory allegations plausibly linking the RIF to discrimination on the basis of Plaintiffs' sex.

Thus, Plaintiffs fail to establish a plausible link between their layoff during the RIF and their sex and fail to state a claim for disparate treatment.

**C.**    **Disparate Impact**

A plaintiff may also bring a Title VII or FEHA claim on the theory that a facially neutral, employment practice created a disparate impact upon a protected class.  *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002); *Mahler v. Judicial Council of Cal.*, 67 Cal. App. 5th 82, 113 (2021). In order to state a disparate impact claim, a plaintiff must allege the existence of a "significant disparate impact on a protected class caused by a specific, identified, employment practice or selection criterion."  *Stout*, 276 F.3d at 1121.  As discussed above, "an employment discrimination plaintiff need not plead a prima facie case of discrimination" to survive a motion to dismiss. *Swierkiewicz*, 534 U.S. at 515.

Twitter first argues that Plaintiffs cannot state a disparate impact claim because they improperly "recast a claim for intentional discrimination as a disparate impact claim."  ECF No. 20 at 23.  Plaintiffs argue that cases "can, and routinely do, proceed under both disparate treatment and disparate impact theories of liability."  ECF No. 27 at 27.

"[A] person may not be sure in advance upon which legal theory she will succeed, and so [parties are permitted] to 'set forth two or more statements of a claim or defense alternately or hypothetically,' and to 'state as many separate claims or defenses as the party has regardless of consistency.'"  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999) (quoting Fed. R.

United States District Court
Northern District of California

United States District Court
Northern District of California

Civ. P. 8(e)(2) (2006)); *accord PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858-59 (9th Cir. 2007).  Thus, Plaintiffs can plead that the RIF was either an act of intentional discrimination or a facially neutral policy that had a disparate impact.  *See Barrett v. Forest Lab'ys, Inc.*, 39 F. Supp. 3d 407, 436 (S.D.N.Y. 2014) ("Nor is it problematic that the [complaint] identifies one practice in support of both a pattern-or-practice disparate treatment claim and a disparate impact claim."); *City of Oakland v. Wells Fargo Bank, N.A.*, Case No. 15-cv-04321-EMC, 2018 WL 3008538, at *15 (N.D. Cal. June 15, 2018) (holding that, although the plaintiff's allegations "suggested intentional discrimination," there was nonetheless a valid disparate impact claim), *rev'd in part on other grounds* 14 F.4th 1030 (9th Cir. 2021).

Twitter does not contest that Plaintiffs can plead in the alternative, but rather argues that "[a] plaintiff can plead in the alternative only if she sets forth facts plausibly pleading each alternative claim."  ECF No. 28 at 16.  As discussed above, Plaintiffs have not set forth facts that plausibly plead a theory of disparate treatment.  Therefore, the remaining question, and the heart of the parties' dispute, is whether Plaintiffs have set forth facts so as to plausibly plead a theory of disparate impact.

### a.  Identification of a Specific Employment Practice

To state a claim on a theory of disparate impact, Plaintiffs must first allege "the occurrence of certain outwardly neutral employment practices."  *Katz v. Regents of the Univ. of Cal.*, 229 F.3d 831, 835 (9th Cir. 2000) (quoting *Palmer v. United States*, 794 F.2d 534, 538 (9th Cir. 1986)).[8]  A plaintiff "generally cannot attack an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact."  *Stout*, 276 F.3d at 1124.

Here, Plaintiffs attack the RIF.[9]  They allege that layoff decisions "were made under

---

[8] Although the plaintiff in *Katz* brought a claim under the Age Discrimination in Employment Act (ADEA), its holding applies to the instant suit because "[t]he criteria applied to a Title VII discrimination claim also apply to claims arising under the ADEA," *Palmer v. United States*, 794 F.2d 534, 537 (9th Cir. 1986), and that "same analytical framework [applies] to claims brought under FEHA."  *Katz v. Regents of the Univ. of Cal.*, 229 F.3d 831, 835 (9th Cir. 2000).

[9] Plaintiffs also allege that the Post-RIF Policy effectuated the mass layoff and "suffice[s] to identify a more specific employment practice."  ECF No. 27 at 19.  However, the Court will not

extremely hurried circumstances, with little if any regard given to employees' job performance, qualifications, experience, and abilities" by "a small group of managers," some of which were brought in from other Musk-owned companies who "did not have much, if any, knowledge about Twitter's operations." ECF No. 1 ¶¶ 19, 21. Twitter argues that Plaintiffs fail to identify a "specific practice, test, or standard" so as to constitute "a specific RIF-related employment practice." ECF No. 20 at 24. Plaintiffs contend that they "plead allegations that go beyond the mere existence of the mass layoff." ECF No. 27 at 29.

A plaintiff can identify a subjective or objective practice used to make the layoff decisions. *Pottenger v. Potlach Corp.*, 329 F.3d 740, 749 (9th Cir. 2003) (holding that an RIF can constitute a specific employment practice because the Ninth Circuit had previously found a "policy of committing employment decisions in an RIF to the subjective discretion of its managers constituted a specific employment practice subject to disparate impact analysis"); *Watson*, 487 U.S. at 991 ("[A] disparate impact analysis may in principle be applied to subjective as well as to objective practices"). Therefore, an RIF can constitute such a practice insofar as the plaintiff alleges that "an employer[] [had a] facially neutral practice of committing employment decisions to the subjective discretion of supervisory employees" because that is "an employment practice properly subject to a disparate impact analysis." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990).

Plaintiffs sufficiently allege the existence of a facially neutral, employment practice: Twitter's delegation of layoff decisions to a small group of managers, which largely did not consider objective criteria – such as "job performance, qualifications, experience, and abilities" – in making its decisions. ECF No. 1 ¶¶ 19, 21. Twitter is incorrect that Plaintiffs need to allege "the factors Twitter did consider that are responsible for the purported disparities" at the pleading stage. ECF No. 28 at 12. Courts have consistently accepted allegations that employment

---

consider whether the Post-RIF Policy constitutes an employment practice because Plaintiffs were not working at Twitter when the Post-RIF Policy was enacted. *Pottenger v. Potlach Corp.*, 329 F.3d 740, 750 (9th Cir. 2003) ("To bring a disparate impact claim, [a plaintiff] must show that [they were] subject to the particular employment practice with the alleged disparate impact."). Regardless of whether the Post-RIF Policy is a "constructive discharge" or not, it was not a discharge to which Plaintiffs were subjected. ECF No. 27 at 30.

United States District Court
Northern District of California

1   decisions were delegated to the subjective discretion of supervisors, and thus devoid of objective

2   criteria, as sufficient so as to constitute an identifiable employment practice.

3          For example, in *Rose*, the Ninth Circuit held that the plaintiff sufficiently identified an

4   employment practice by alleging that "[e]mployment decisions as to which jobs would be

5   eliminated" and the question of "who would fill the remaining positions" were "essentially left to

6   the discretion of the managers" during an RIF.  902 F.2d at 1420, 1424-25.  The Ninth Circuit did

7   not require the plaintiff to identify the criteria managers relied upon in exercising their discretion.

8          Similarly, in *National Fair Housing Alliance v. Federal National Mortgage Association*,

9   294 F. Supp. 3d 940, 948 (N.D. Cal. 2018), the plaintiff identified the delegation of discretion and

10  failure to consider objective factors as the specific employment practices.  The court held that the

11  policies identified by plaintiff – "delegation of discretion [to lower-level Fannie Mae employees]

12  or failure to supervise and differential maintenance based on the properties' age and value"– were

13  "sufficient as a matter of law" to allege that Fannie Mae's upkeep of Real Estate Owned properties

14  had a disparate impact on communities of color.  *Id.*  The court in *Ramirez v. GreenPoint*

15  *Mortgage Funding, Inc.*, 633 F. Supp. 2d 922, 928 (N.D. Cal. 2008), similarly held that a policy

16  which "allegedly allowed [the defendant's] loan officers and brokers to charge additional fees

17  based on subjective criteria rather than objective criteria related to creditworthiness" was a

18  sufficient employment practice.

19         Thus, Plaintiffs sufficiently allege a specific employment practice.

20                        **b.      Causation**

21         Plaintiffs must also allege that the identified employment practice caused "a significant

22  disparate impact on a protected class."  *Stout*, 276 F.3d at 1121.  Such allegations largely include

23  "statistical evidence of a kind and degree sufficient to show that the practice in question has

24  caused" caused the disparate impact.  *Watson*, 487 U.S. at 994.

25         Plaintiffs have not sufficiently alleged that the managers' ability to exercise their discretion

26  caused the gender disparity in the layoffs overall, and critically, Plaintiffs' own layoffs.  They rely

27  upon statistics and Musk's statements to demonstrate that "women were far more likely than men

28  to be laid off from Twitter."  ECF No. 1 ¶ 39.  However, as discussed previously, Plaintiffs fail to

United States District Court
Northern District of California

allege basic facts that would situate them within the statistics. Plaintiffs allege almost nothing about themselves – including their positions prior the RIF or their qualifications and performance history – that place the statistics in context.

Although "contentions regarding whether the Plaintiffs' methodology is flawed are best reserved for resolution at summary judgment phase," *Nat'l Fair Hous. All.*, 294 F. Supp. 3d at 948, Plaintiffs must nonetheless show that their statistics analyze the correct group, or does not otherwise "use[] the wrong denominator" to plausibly plead causation between the employment practice and the disparate impact. *Liu v. Uber Techs. Inc.*, No. 20-cv-07499-VC, 2022 WL 1613285, at *1 (N.D. Cal. May 23, 2022). The Court cannot determine whether Plaintiffs sufficiently alleged causation without allegations as to which group Plaintiffs belonged to at Twitter. Thus, they have failed to allege causation. Accordingly, Plaintiffs have also failed to state a disparate impact claim.

### D. Declaratory Judgment Act

As discussed above, Plaintiffs' counsel has already obtained agreement from Twitter that they will not seek the general releases of claims from Twitter employees without notice of the instant suit and associated rights. Therefore, Plaintiffs' claim under the Declaratory Judgment Act, seeking such an injunction, is moot. *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 815 (9th Cir. 1995). The Court dismisses this claim without prejudice. If Plaintiffs wish to amend their complaint with a request for injunctive relief, they must identify how the relief they now seek differs from that already obtained in *Cornet*.

### E. Motion to Strike Class Claims

Twitter also asks that the Court strike the class action claims, arguing that "[b]ecause Plaintiffs could not have been injured by the Post-RIF Policies, they lack standing to assert a disparate impact claim arising from the alleged injuries of others who were subject to those policies." ECF No. 20 at 28. Twitter further argues that Plaintiffs fail to "plead a precise and ascertainable class definition." *Id*. at 31. Because the Court has dismissed all the claims in the complaint, however, it need not and does not decide Twitter's alternative motion to strike. The Court denies Twitter's request to strike as moot.

15

1      Twitter is entitled to raise this alternative argument in response to any amended complaint,

2  but Twitter should be aware that the Court disfavors striking class allegations in lieu of or prior to

3  a fully briefed motion for class certification brought after discovery has been completed.  *See*

4  *Thorpe v. Abbott Labs., Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008) ("Motions to strike

5  class allegations are disfavored because a motion for class certification is a more appropriate

6  vehicle for the arguments [the defendant] advances herein."); *see e.g.*, *Falkenberg v. Alere Home*

7  *Monitoring, Inc.*, No. 13-cv-00341-JST, 2015 WL 800378, at *5 (N.D. Cal. Feb. 23, 2015).

8                    **CONCLUSION**

9      For the foregoing reasons, Twitter's motion is granted.  Plaintiffs' complaint is dismissed

10  with leave to amend because Twitter has not shown that amendment would prejudice Twitter, is

11  sought in bad faith, would produce an undue delay, or would be futile.  *See AmerisourceBergen*

12  *Corp v. Dialyst West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).  Plaintiffs may file an amended

13  complaint within twenty-one days of this order solely to cure the deficiencies identified by this

14  order.  Failure to file a timely amended complaint will result in dismissal with prejudice.

15      **IT IS SO ORDERED.**

16  Dated:  May 8, 2023



JON S. TIGAR
United States District Judge

EXHIBIT 2

5/4/23, 3:50 PM
Case 3:23-cv-01786-SI Document 20 Filed 05/12/23 Page 23 of 29
Confusion and Frustration Reign as Elon Musk Cuts Half of Twitter's Staff - The New York Times

**The New York Times** | https://www.nytimes.com/2022/11/04/technology/elon-musk-twitter-layoffs.html

# Confusion and Frustration Reign as Elon Musk Cuts Half of Twitter's Staff

The layoffs hit across many divisions, including the engineering and machine learning units, the teams that manage content moderation, and the sales and advertising departments.

**By Kate Conger, Ryan Mac and Mike Isaac**

Nov. 4, 2022

SAN FRANCISCO — When the ax came down at Twitter on Friday, it did not fall smoothly.

The first sign that some of the company's 7,500 employees had been laid off came when their email accounts were shut off late Thursday. Yet they received no official word about termination and some of their Slack accounts still worked. In Twitter's offices in Ireland and Britain, employees stayed up late waiting for the San Francisco headquarters to inform them of their job status. Some learned they were unemployed in the middle of their night.

The cuts were so haphazard that at one late-night meeting about the Twitter Blue subscription product, at least one worker was locked out of the company's systems during the call, according to three people with knowledge of the meeting and internal messages viewed by The New York Times.

Many employees vented on Twitter. Chris Younie, a member of the partnerships team based in London, discovered he had been laid off when he checked his corporate laptop and email account after midnight and could not access the internal systems.

"So grateful this is happening at 3am," Mr. Younie posted sarcastically on Twitter. "Really appreciate the thoughtfulness on the timing front guys."

By early Friday, the scale of the layoffs by Elon Musk, Twitter's new owner, was becoming clear: Roughly half of the company's work force, or about 3,700 jobs, had been eliminated, four people with knowledge of the matter said. The cuts hit across many divisions, including the engineering and machine learning teams, the trust and safety teams that manage content moderation, and the sales and advertising departments. Rarely have layoffs this deep been made by a single individual at a tech company.

On Saturday, Jack Dorsey, Twitter's co-founder, apologized to the company's former and current employees in a tweet. "I realize many are angry with me," he wrote. "I own the responsibility for why everyone is in this situation: I grew the company size too quickly."

The layoffs leave Twitter significantly changed just over a week after Mr. Musk closed his blockbuster $44 billion buyout of the company. The actions raise questions about how the world's richest man can effectively operate the social media service and carry out his ambitious plans for it, including adding new product features, boosting the number of users and finding other revenue streams.

Mr. Musk, 51, faces numerous challenges at Twitter, which he has taken private. He is under financial pressure to make the deal work, having taken on $13 billion in debt for the buyout. Yet the company has lost money for eight of the past 10 years and, like other social media companies, faces a decline in digital advertising amid a slowing economy.

At the same time, some advertisers, which provide 90 percent of Twitter's revenue, have paused their spending on the platform, citing fears over how the site's content might change under Mr. Musk. That pullback accelerated on Friday as advertisers like Volkswagen Group joined the growing boycott. Civil rights groups have repeatedly warned that loosening Twitter's content rules might lead to a rise in toxic speech.

On Friday, Mr. Musk addressed Twitter's layoffs while speaking at an investment conference in New York. He said the cuts were needed because "Twitter was having pretty serious revenue challenges and cost challenges" before the deal, which have been made worse by "activist groups pressuring major advertisers to stop spending money on Twitter."

He added that he had tried "every possible thing to appease" these activists and reiterated that he had not changed Twitter's content rules. He later said in a tweet that the company was losing more than $4 million a day.

Twitter's communications team, which was almost entirely laid off, did not respond to a request for comment. Mr. Musk did not respond to a request for comment.

Sandra Sucher, a professor of management at Harvard University who has studied layoffs for more than a decade, said Twitter's cuts were among the most poorly handled that she had seen. While the scale was not unprecedented, it was unusual to see layoffs done so quickly without a detailed explanation provided to workers about who was being laid off and why, she said.

"This is a master class in how not to do it," Ms. Sucher said. "If you were going to rank order ways to upset people, telling them you're going to do it in advance, without rationale, that is a particularly inhumane way to treat them."

Mr. Musk already faces legal challenges from the layoffs. On Friday, five former Twitter workers filed a class-action lawsuit against the company for failing to give advance notice of the cuts. California and federal laws require companies to notify workers in advance of mass layoffs.

While Mr. Musk said in a tweet on Friday that laid-off workers were offered three months' severance, U.S. employees were told that they would be kept on the payroll for two months before being officially terminated, a maneuver that could help Twitter skirt the advance notice required by law for a mass layoff. The employees could then receive an additional month of severance.

Mr. Musk ordered the job cuts across Twitter shortly after taking ownership of the company on Oct. 27. Over the past week, workers braced for layoffs by creating groups on messaging apps to maintain communications with each other in case anything happened. Some added each other on LinkedIn and exchanged personal emails and phone numbers in meetings, said five former and current employees.

On Thursday evening, employees received a companywide email that said the layoffs would begin on Friday. They were instructed to go home and not go to the offices on Friday.

"This action is unfortunately necessary to ensure the company's success moving forward," the email, which was signed Twitter, said.

On Twitter, employees posted the hashtags #OneTeam and #LoveWhereYouWorked to commiserate with one another. Some soon tweeted that they had been logged out of their work computers or internal platforms like Slack.

But access was cut in a staggered and seemingly arbitrary fashion. Some people received text messages from colleagues saying they had been logged out of some work apps but were temporarily able to open their email or work apps, before they eventually lost access, too.

In Dublin, home to Twitter's European headquarters, some workers received an email on Friday morning about the cuts. "These decisions never come easy and it is with regret that we write to inform you that your role at Twitter has been identified as potentially impacted or at risk of redundancy," it said.

In the Tokyo office, some Twitter workers received the same email toward the end of their workday on Friday, one worker there said.

Other employees were still being summoned to meetings. Esther Crawford, a project manager, asked people to join a "standup" meeting at 9:30 p.m. in San Francisco on Thursday as some layoff notices went out.

"I recognize this is a crazy moment where Tweeps are losing access and the layoff is in progress," she wrote on Slack, adding a broken heart emoji and a link to a video conferencing room, according to messages viewed by The Times. Ms. Crawford works on Twitter Blue, a subscription product that faces a Nov. 7 deadline for rolling out or those on the team face termination.

A small group of employees tuned into the meeting via video conference as Ms. Crawford walked through product updates and troubleshooting issues. Suddenly, one member of the team dropped off in the middle of the call, said three people with knowledge of the incident. The person's access had been cut off from the Twitter network.

Many of the cuts were deep. The human rights and disability experience teams were cut back, said three people familiar with the decision. The internet technology team — which is partly responsible for keeping the site functioning — became "a skeleton crew," two people said. The marketing, social, curation, studio and enforcement teams, and the "Redbird" division of platform and infrastructure support, were also hit.

People who work from home were targeted for cuts, two people said.

On Friday morning at Twitter's San Francisco offices, which were closed to most employees, at least nine security guards patrolled the two buildings that make up the headquarters, pacing around the perimeter and checking that some doors were locked. On a floor above one of the lobbies, the lights overhead were dim.

Those who were not let go tried to assess who remained, according to private group messages seen by The Times. They traded notes of support for workers who lost their jobs while they were pregnant or on work visas. Some employees had volunteered to be laid off so that colleagues on visas would not lose their jobs, two people familiar with the layoffs said.

Laid-off workers were told not to publicly discuss their experience, according to a copy of the dismissal email seen by The Times. They were also told that they would receive more information about severance in a week, and they had not gotten separation agreements, former employees said. They said they gleaned that severance would probably be less than what Twitter's previous management would have paid.

Lauren Hirsch, Emma Goldberg, Chang Che, Adam Satariano, Ben Dooley and Kalley Huang contributed reporting.

EXHIBIT 3



ELON MUSK • Published March 27, 2022 10:25am EDT

# 'Lonely' Elon Musk says humans shouldn't live longer, they will 'asphyxiate' society

Elon Musk says US has 'very ancient leadership,' old ideas 'wouldn't advance' society

By **Danielle Wallace** | **FOXBusiness**

**Elon Musk warns Russian airstrikes could target Starlink satellites in Ukraine**

Former FCC Chairman Ajit Pai discusses the relevance of the communications sector in military operations on 'The Claman Countdown.'

Tesla and Space X founder Elon Musk said in a recent interview that he doesn't believe humans should live longer because their old ideas would create "asphyxiation of society," preventing advancement.

While the tech billionaire categorized declining birthrate as the "single biggest threat to the future of human civilization," Musk told Mathias Döpfner, the CEO of Business Insider's parent company, Axel Springer, in an interview at the Tesla Factory in Freemont, California, that longevity was less of a concern to him.

"I don't think we should try to have people live for a really long time. That it would cause asphyxiation of society because the truth is, most people don't change their mind," Musk said. "They just die. So, if they don't die, we will be stuck with old ideas and society wouldn't advance."

**ELON MUSK'S 'VERY EFFECTIVE' STARLINK KEEPING UKRAINIANS ONLINE DURING RUSSIAN INVASION**

5/4/23, 3:51 PM Lonely? Elon Musk says humans shouldn't live longer, calls for 'asphyxiate' society | Fox Business

Case 3:23-cv-01786-SK Document 20 Filed 05/12/23 Page 27 of 29

For democracy to function properly, Musk argued that political leadership should ideally be within 10 to 20 years of the average age of the population they govern. On the issue of his own humanity, Musk said that while maintaining his health is important, he is not afraid of dying as it would "come as a relief."

"I think we already have quite a serious issue with gerontocracy, where the leaders of so many countries are extremely old," Musk told Döpfner. "In the U.S., it's a very, very ancient leadership. And it is just impossible to stay in touch with the people if you are many generations older than them."

Elon Musk attends the opening of the Tesla factory Berlin Brandenburg in Gruenheide, Germany, Tuesday, March 22, 2022. (Patrick Pleul/Pool via AP / AP Newsroom)

---

"The founders of the USA put minimum ages for a local office. But they did not put maximum ages because they did not expect that people will be living so long. They should have," he continued. "Because for a democracy to function, the leaders must be reasonably in touch with the bulk of the population. And if you're too young or too old, you can't say that you will be attached."

Answering a plea on Twitter from Ukraine's digital minister within 48 hours, Musk first began sending Starlink terminals to Ukraine last month after Russian cyber-attacks and shelling disseminated internet connectivity within the first days of the invasion. Despite Russia's anti-satellite missile demonstration months ago, Musk said he did not believe Russians could take out Starlink's some 2,000 satellites fast enough. While SpaceX designs and manufactures its own rocket engines, Russia's move to stop sending rocket engines to U.S. companies in response to sanctions over the war in Ukraine could impact Boeing and Lockheed in the short term until they move toward Blue Origin engines, Musk said.

"I think I can be helpful in conflicts," Musk said of his role in keeping Ukrainians online during the war so far. "I try to take a set of actions that are most likely to improve the probability that the future will be good. And obviously sometimes I make mistakes in this regard. I do whatever I think is most likely to ensure that the future is good for humanity. Those are the actions that I will take."

**Image 1 of 2**

German Chancellor Olaf Scholz talks to Elon Musk at the opening of the Tesla factory Berlin Brandenburg, which is designed for 500,000 vehicles per year, in Gruenheide, Germany. | AP Newsroom

---

Despite his estimated net worth of $260 billion and nearly 80 million followers on Twitter, Musk said he considers himself a lonely person and would describe himself as being "medium happy."

"There are times when I'm lonely. I'm sure there are times when everyone is lonely. But it's pretty basic," Musk said. "Say if I'm working on the starship rocket and I'm just staying in my little house by myself, especially if my dog is not with me, then I feel quite lonely because I'm just in a little house by myself with no dog."

Musk and Canadian musician Grimes recently have broken up again, though the pair welcomed their second child, a daughter, months ago via surrogate.

On matters of climate and sustainability, Musk argued that it was "total madness" for Germany to be shutting down its remaining nuclear power stations this year, saying doing so amid Russia's invasion of Ukraine posed a "national security risk."

Earlier this month, Germany's Economy Minister Robert Habeck said the country needs to build up alternative energy sources at "Tesla space" to cut reliance on Russian gas, according to Reuters.

**[CLICK HERE TO READ MORE FROM FOX BUSINESS](#)**

But Musk told Döpfner that while he sees solar energy being the main way civilization is powered in the future, between now and then it's imperative to maintain nuclear energy, especially in Germany and other countries where there's no massive natural disaster risk.

Musk also discussed developing Optimus, Neuralink and Starship technologies.



Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.

This material may not be published, broadcast, rewritten, or redistributed. ©2023 FOX News Network, LLC. All rights reserved. FAQ - New Privacy Policy